IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 2, 2018 Session

## IN RE MICHAYLA T. ET AL.

**Appeal from the Juvenile Court for Warren County**
**No. 17JV1050     William M. Locke, Judge**

_____

**No. M2018-00367-COA-R3-PT**

_____

A mother appeals the termination of parental rights to her two children. After investigating a report of drug exposure, the Tennessee Department of Children's Services ("DCS") obtained emergency temporary custody of the children. After nearly ten months, DCS petitioned to terminate the mother's parental rights. The juvenile court found by clear and convincing evidence six statutory grounds for termination: abandonment by failure to establish a suitable home, abandonment by an incarcerated parent by willful failure to support, abandonment by wanton disregard, substantial noncompliance with the permanency plans, persistence of conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility for the children. The court also found by clear and convincing evidence that termination of the mother's parental rights was in the children's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Christina S. Stanford, McMinnville, Tennessee, for the appellant, Karen C.

Herbert H. Slatery III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I.

On September 30, 2016, detectives from the Warren County Sheriff's Department executed a search warrant at the home of Karen C. ("Mother") and Eric C. ("Stepfather"). They resided in the home with two children: "Daughter," born in 2002, and "Son," born in 2003. The detectives seized approximately three ounces of crystal methamphetamine, digital scales, over $1300 in cash, and other drug paraphernalia from the residence. Mother and Stepfather were arrested and charged with possession of a Schedule II Controlled Substance for resale, possession of drug paraphernalia, and child abuse/neglect/endangerment. The sheriff's department temporarily placed the children with their maternal grandparents.

DCS became involved the next day after receiving a report of drug exposed children. DCS interviewed the children and learned, among other things, that Mother smoked marijuana in their presence and had become increasingly more verbally and physically aggressive. Daughter had been hospitalized for multiple suicide attempts.

After her release from jail on October 2, Mother refused to cooperate with DCS. Mother explained that her criminal attorney advised her not to speak to DCS at the risk of incriminating herself for her upcoming criminal trial. Stepfather, who cooperated with DCS after a fashion, disclosed that Mother and he used marijuana and methamphetamine daily.

DCS learned at the first child and family team meeting that the children had been sleeping on the same couch at maternal grandparents' home and that maternal grandfather had dementia. The following day, on October 5, in the Juvenile Court for Warren County, Tennessee, DCS petitioned to declare the children dependent and neglected and to obtain temporary legal custody of the children. According to DCS, "the children cannot be adequately protected from abuse or neglect in the parent(s)' home." On the same day, the court entered a protective custody order placing the children in the temporary care and custody of DCS.

On January 23, 2017, the court found the children to be dependent and neglected in the care of the Mother. A total of three permanency plans were created in October 2016, March 2017, and August 2017. Mother's responsibilities under the plans remained largely the same.

In March 2017, a grand jury indicted Mother on four charges in connection with the September 2016 search of her home. Mother was arrested for the charges on March 9 and released on June 28. She pled guilty to the felony delivery of methamphetamine

charge and received a four-year sentence, 120 days in jail followed by supervised probation. The remaining charges were dismissed.

Only after her release from jail did Mother contact DCS and begin working on the steps of her permanency plans. She completed an alcohol and drug assessment, which recommended intensive outpatient treatment. Initially, this recommendation went unheeded.

On July 31, 2017, DCS petitioned to terminate Mother's parental rights. The petition alleged six grounds: abandonment by failure to establish a suitable home, abandonment by an incarcerated parent for failure to support, abandonment by wanton disregard, substantial noncompliance with the permanency plans, persistence of conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility for the children.[1]

After the filing of the termination petition, Mother's struggles continued. In August, Mother submitted to and failed two drug screens. Mother was subsequently charged with violation of probation.

On September 8, 2017, Mother was stopped in Grundy County because there was a warrant for her violation of probation. A search of Mother's car revealed methamphetamine and drug paraphernalia, and she was charged with felony possession of a Schedule II Controlled Substance. Her probation was revoked, and she was jailed in Warren County from September 8 to December 13. Mother was then jailed in Grundy County on December 13-14.

The trial of the parental termination case took place the following month. In support of the petition, along with numerous exhibits, DCS offered the testimony of the children, the children's school-based therapist, the children's case manager at a health care organization, and the DCS family services worker. In opposition, Mother offered her own testimony and the testimony of an employee of an inpatient treatment program. Mother had started the program after being released from jail in mid-December.

The juvenile court terminated Mother's parental rights. The court found clear and convincing evidence of all six of the alleged statutory grounds for termination. The court also found clear and convincing evidence that termination of Mother's parental rights was in the best interest of the children. Mother appealed.

---

[1] The petition also sought the termination of the parental rights of the children's father, Paul R. ("Father"). On October 30, 2017, Father surrendered his rights to the children; his parental rights are not at issue in this appeal.

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

4

# III.

## A. GROUNDS FOR TERMINATION

On appeal, Mother challenges each of the six grounds relied on by the juvenile court for termination of her parental rights. Three of those grounds relate to Mother's abandonment of the children. Termination proceedings may be initiated when "[a]bandonment by the parent . . . has occurred." Tenn. Code Ann. § 36-1-113(g)(1).

### 1. Abandonment Grounds

The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (2017) (defining the term "abandonment"). The court concluded that Mother abandoned the children under the second and fourth definitions. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii), (iv).

### a. Failure to Establish a Suitable Home

A child has been abandoned under the second statutory definition of "abandonment" if the child has been removed from the home of a parent as a result of a finding that the child was dependent and neglected, and

> for a period of four (4) months following the removal, the department . . . has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but . . . the parent . . . ha[s] made no reasonable effort[] to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal." *Id.* In evaluating those efforts, we are concerned with the time period from October 6, 2016, to February 5, 2017.

We conclude that clear and convincing evidence supports the juvenile court's finding that Mother abandoned her children by failure to establish a suitable home. The proof established that Mother made no efforts toward providing her children a suitable home during the four months following their removal. She focused instead on resolving her criminal charges. As Mother acknowledges, "[i]t was not until [she] was released from jail in mid-summer 2017 that she evidenced a true desire to remedy the problems that plagued her." During the first four months following the children's removal, DCS,

on the other hand, conducted several child and family team meetings, developed the initial permanency plan, provided a list of alcohol and drug assessment facilities, and offered Mother transportation to an alcohol and drug assessment.

On appeal, Mother submits that she "suffered from [an] addiction to an extremely addictive, damaging drug" and that "[t]o expect her to successfully kick this addiction and resolve her legal charges in order to provide a suitable home quickly [wa]s unrealistic." She also complains that DCS "simply moved too fast" to terminate her parental rights. But these arguments miss the mark as they focus on goals or outcomes and not efforts. Mother single-mindedly focused on her criminal charges. Surely "reasonable efforts" include, at a minimum, taking steps to address her addiction and accepting the assistance of DCS.

b. Abandonment by an Incarcerated Parent

The fourth definition of "abandonment" applies in cases in which the parent is incarcerated or had been incarcerated within the four-month period preceding the filing of the petition to terminate and "contains two distinct tests for abandonment." *In re Audrey S.*, 182 S.W.3d at 865. One test examines pre-incarceration visitation and support, and the other examines the pre-incarceration conduct of the parent. The incarcerated or formerly incarcerated parent is deemed to have abandoned a child if he or she:

> either . . . has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv). The juvenile court found that DCS had proven by clear and convincing evidence that Mother had abandoned her children under both tests.

i. Willful Failure to Support

While it is undisputed that Mother was incarcerated within the four-month period preceding the filing of the termination petition and failed to make any payments at all toward the support of her children during the four-month period preceding her incarceration, Mother contends that her failure to support was not willful. The question of willfulness "is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013). A parent's failure to support a child is not willful if the parent is financially unable to do so. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014). In making a willfulness determination,

6

the court must review a parent's means, which includes both her income and available resources for purposes of support. *See In re Adoption of Angela E.*, 402 S.W.3d at 641.

We conclude that Mother willfully failed to support her children during the four months preceding her incarceration. Here, Mother admitted that the auto body and auto repair shop owned by her and Stepfather generated income sufficient "to support [them] and [their] kids" during the relevant four-month period. Despite Mother's contention to the contrary, DCS need not present further evidence of both her income and available resources to ascertain whether she had the means to support her children in light of her admission that she could support her children. *See, e.g.*, *In re Sydney B.*, 537 S.W.3d 452, 460 (Tenn. Ct. App.), *perm. app. denied*, (Tenn. 2017) (holding that father willfully failed to support the child because "unlike the typical case, there is no dispute . . . that Father had the ability to pay support for the child"); *In re Serenity L.*, No. E2014-02475-COA-R3-PT, 2015 WL 4594520, at *22-23 (Tenn. Ct. App. July 31, 2015) (holding that mother willfully failed to support her child when she admitted that she had the ability to pay during the relevant time period but paid nothing).

### ii. Wanton Disregard for the Welfare of the Children

As to the second test, Mother argues that the court should not have considered events occurring after her release from incarceration as proof of the existence of this ground. On appeal, our review is not limited to the parent's behavior during the four months preceding the incarceration. *In re Audrey S.*, 182 S.W.3d at 871. Rather, "the parent's incarceration [is] a triggering mechanism that allows the court to take a closer look . . . to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child. *Id.* at 866.

"Wanton disregard" is not a defined term. "[A]ctions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68.

Clear and convincing evidence supports the juvenile court's finding that Mother's pre-incarceration conduct exhibited wanton disregard for her children's welfare. Mother's substance abuse led to her incarceration and contributed to the subsequent removal of the children. Mother smoked marijuana in the children's presence and in the car. And according to Daughter, Mother forced her to take illegal drugs.

7

The proof further showed that Mother failed to provide adequate support or supervision for the children. Despite Daughter's history of multiple suicide attempts, Mother did not seek consistent treatment for Daughter. Mother rarely took the children to the doctor or the dentist. While the children were in foster care, it was discovered that Son had twelve cavities and Daughter had four, and both children needed glasses badly.

Mother also actively abused the children. The children reported that Mother hit them and called them names. Daughter had lost 70% of the hearing in her left ear from repeated blows to the area.

2. Substantial Noncompliance with the Permanency Plans

In addition to grounds based on abandonment, the juvenile court found three other statutory grounds for terminating Mother's parental rights. The court found that Mother failed to substantially comply with her responsibilities in the permanency plans. *See* Tenn. Code Ann. § 36-1-113(g)(2).

Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "reasonable and are related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014); *see also In re Valentine*, 79 S.W.3d at 547. If the permanency plan requirements are reasonable, the court must then determine if the parent's noncompliance was substantial. *Id.* at 548-49. The unsatisfied requirements must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

We agree with the juvenile court that the plan requirements in this instance were reasonable and related to the conditions that necessitated the removal of the children. DCS removed the children because of concerns about drug use, criminal behavior, and child abuse/neglect/endangerment. The permanency plans required Mother to submit to an alcohol and drug assessment and follow all recommendations, provide DCS with bi-weekly AA/NA meeting confirmation forms and contact information for her sponsor, sign releases of information with all of the A & D providers, submit to random and scheduled urine drug screens as well as hair follicle drug screens, submit to random pill counts, resolve all pending legal charges and not obtain any new charges, abide by any probation/jail sentencing, submit to a psychological evaluation with a parenting component and follow all recommendations, complete domestic violence counseling, and obtain and maintain safe and stable housing and a legal means of income.

Next, we must determine whether Mother's noncompliance is substantial in light of the importance of the requirements to the overall plan. *See In re Valentine*, 79 S.W.3d

at 548-49. Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). "[A] permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives." *In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014). "[P]arents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis." *Id.*

After the children's removal, Mother refused to cooperate with DCS to regain custody of her children. Although she was invited to participate in the creation of the first permanency plan, Mother failed to even show up. Mother blames her criminal defense attorney for her failure to engage with DCS. But advice of counsel does not excuse Mother's lack of compliance with the permanency plans. Additionally, Mother conceded that the guardian ad litem advised her, on November 30, 2016, of the possibility that her parental rights could be terminated if she continued to distance herself from DCS.

As noted above, on appeal, Mother also conceded that she "did not truly make efforts to complete these requirements until after her release from jail on June 28, 2017." She argues that, by the time of trial, she had substantially complied with most of the requirements of the permanency plans and that her efforts and improvements should not be discounted. We disagree.

The evidence is clear and convincing that Mother failed to substantially comply with the requirements of the permanency plans. By the trial date, Mother had only complied with the requirement of submitting to an alcohol and drug assessment. Mother partially complied with the requirement of submitting to random and scheduled urine drug screens, more often than not refusing such requests. She had started an inpatient treatment program, but only in the month prior to the trial. And Mother only partially complied with the requirement that she resolve all pending legal charges. At the time of trial, one charge was still pending. While "[i]mprovement toward compliance should be considered in a parent's favor," *In re Valentine*, 79 S.W.3d at 549, Mother's efforts fell short in this case.

3. Persistence of Conditions

Next, the juvenile court found termination of Mother's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having

9

a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. The ground applies as a basis to terminate parental rights when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

Here, it is undisputed that the child was removed for more than six months from Mother's home by court order adjudicating the children to be dependent and neglected. Mother argues, however, "that the conditions that necessitated removal of the children from Mother's custody no longer exist[]."

From our review, clear and convincing evidence establishes that the conditions that necessitated removal of the children persist. Mother still struggles with abuse of illegal drugs. Less than five months prior to the trial, Mother was found in possession of methamphetamine. Additionally, due to her possession of a Schedule II Controlled Substance, she has a new criminal charge to resolve.

Based on this record, we further conclude that the evidence was clear and convincing that there was little likelihood that Mother could remedy her substance abuse

10

and other issues in the near future so that the children could be safely returned to her. Even if substance abuse were her only issue, Mother acknowledged that she had, at a minimum, another seven and a half months of inpatient treatment to complete. The employee of the inpatient treatment program testified that the program could take a year, meaning Mother would potentially have another ten months of treatment.

We also have little difficulty in concluding that continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home. The children's foster home is a safe, stable, and potentially permanent home. Mother offers only the slightest glimmer of hope that she can overcome the numerous issues that prevent integration of the children back into her life.

4. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility for the Children

Finally, the court found termination of parental rights appropriate under § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14).

As to the first prong, DCS must prove by clear and convincing evidence that Mother failed to manifest an ability and willingness to personally assume legal and physical custody of the child **or** that she failed to manifest an ability and willingness to personally assume financial responsibility for the child. *See In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). Ability focuses on the parent's lifestyle and circumstances. *See In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018); *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017). When evaluating willingness, we look for more than mere words. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018) ("Although Mother testified that she was both willing and able, her actions proved otherwise."); *In re Amynn K.*, 2018 WL 3058280, at *15 ("We recognize that Father has repeatedly verbalized his willingness to assume custody of the Child. However, Father's actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to Father's actual willingness to assume custody or financial responsibility for the Child."). Parents must have demonstrated their

11

willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child. *See In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at \*18 (Tenn. Ct. App. May 8, 2018) (focusing on the mother's lack of effort to remove the threat of domestic violence); *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*7 (Tenn. Ct. App. Apr. 4, 2018) (focusing on the mother's lack of effort to fulfill her responsibilities in the parenting plan); *In re M.E.N.J.*, 2017 WL 6603658, at \*7 (noting the mother's refusal to work with her case manager to obtain affordable housing).

With respect to the second prong, DCS must establish that placing the child in Mother's custody would pose a risk of substantial harm to the physical or psychological welfare of the child by the same quantum of proof. *See In re Maya R.*, 2018 WL 1629930, at \*7. Previously, we have described "a risk of substantial harm" in these terms:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

The evidence was clear and convincing that Mother failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility for her children. Although Mother was in an inpatient treatment program by the time of trial, she had only been in the program for a month and a half. She lacked the current ability to assume custody of her children or to be financially responsible for them. Other than finally seeking inpatient treatment for her addiction, Mother otherwise failed to demonstrate her willingness to overcome the obstacles that prevent her from assuming custody of the children. As noted above, initially, she was unwilling to see past her own legal troubles to work with DCS toward a reunification with her children. And Mother's failure to pay any child support at all, even when she had the means to pay, evidenced an unwillingness to assume financial responsibility for the children.

We further conclude that placing the children in Mother's custody would pose a risk of substantial harm to the children's physical or psychological welfare. Mother has demonstrated an appalling lack of concern for the children's welfare. The children testified that they did not want to return to Mother and also testified to the abuse they suffered in Mother's care. The children's counselor specifically opined that placing the

children in Mother's custody would pose a substantial risk of harm to their physical or psychological welfare. According to the counselor, the children would regress, and specifically, Daughter would be at an increased risk of suicide. In the weeks leading up to trial, Daughter cut herself, fearing the possibility of returning to Mother.

## B. BEST INTEREST OF THE CHILDREN

Next we must determine whether termination of Mother's parental rights is in the children's best interest. Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts may consider in making a best interest analysis. The best interest "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682.

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn.), *cert. denied sub nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016).

After considering the evidence in light of the statutory factors, the juvenile court found all relevant statutory factors favored termination of Mother's parental rights. *See* Tenn. Code Ann. § 36-1-113(i). The evidence does not preponderate against these factual findings.

The first statutory factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." *Id.* § 36-1-113(i)(1). Mother had only been in treatment for a month and a half. When asked whether Mother planned to establish a safe and stable home and a legal means of income when she leaves the inpatient treatment program, she answered "it's a little bit early, but [she was] working on that." As the juvenile court noted, "[a]s of the day of this hearing, she is finally making an effort, but has accomplished nothing."

Mother argues that her "ability to begin passing drug screens prior to trial" and "her willingness to follow-through to enter an inpatient facility and make progress" was "more than 'nothing.'" While Mother passed two drug screens in August 2017, the progress was short-lived. One month later, Schedule II drugs were found in her possession while she was in Grundy County. And Mother refused a urine drug screen on December 13, 2017, so her ability to pass a drug screen in the weeks leading up to trial was questionable. Even if we consider Mother's belated effort in entering an inpatient facility one month and a half prior to trial, this fact alone is insufficient to demonstrate an adjustment of circumstance necessary for this factor to weigh in her favor.

Similarly, the second factor considers the potential for lasting change by asking "whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." *See id.* § 36-1-113(i)(2). Mother initially resisted working with DCS because she feared incriminating herself in her upcoming criminal trial, suggesting that she cared more for herself than her children. Because of her belated efforts, whether Mother can make a lasting adjustment of circumstance or conduct remains to be seen.

The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). On appeal, Mother does not dispute that there was no meaningful relationship between her and the children at the time of trial. Rather, Mother blames the lack of a relationship on DCS's "alienat[ion of the] children from" her, a factor "beyond [Mother's] control."

Despite Mother's contention otherwise, the children themselves denied having any meaningful relationship with her, even before DCS's involvement. Each child described traumatic incidents that happened when they lived with Mother. The children also wrote letters, which were entered into evidence, pleading that they not be returned to Mother, whom they referred to as "Karen." They described her as a "horrible woman," "the monster they warn you about when you're little," "what nightmares are made of," and "unsafe."

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *See* Tenn. Code Ann. § 36-1-113(i)(5). The children's counselor testified that both children were diagnosed with major depressive order and PTSD. Daughter additionally had severe anxiety, had panic attacks, and attempted suicide at least five times. The counselor traced the children's symptoms and struggles back to Mother.

Since being removed from Mother's custody, both children were getting the help they needed and were learning to cope. Neither child desired to be returned to Mother.

14

The counselor opined that the children would regress if they were returned to Mother's care.

Under the sixth factor, the court determines whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. *See id.* § 36-1-113(i)(6). The court found that a person residing with Mother committed abuse toward the children. And both children testified that they were victims of Mother's physical abuse and neglect.

The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [the intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). The court found that Mother could provide "no home" for the children because Mother was living at an inpatient rehabilitation center. And in the year leading up to trial, Mother incurred multiple criminal charges, was arrested, and violated her probation, all of which stemmed from her addiction to drugs.

The ninth factor looks at the parent's child support history. *See id.* § 36-1-113(i)(9). Mother argues that this factor should not be used in the best interest analysis because no evidence was presented as to actual figures of Mother's income and expenses. But this factor focuses on whether Mother paid any child support at all, not on whether Mother's failure to do so was willful. *See In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *17 (Tenn. Ct. App. Apr. 20, 2016) ("Although the Department did not carry its burden to prove that Parents' failure to support was willful, the best interest factors do not require willfulness."). And we previously determined that Mother's failure to pay child support was willful. So Mother's argument is unavailing.

Considering the record as a whole, we conclude that the combined weight of the proof amounts to clear and convincing evidence that termination of Mother's parental rights was in the children's best interest. The children were in a foster home with foster parents that wished to adopt them, and the children themselves want to be adopted by their foster parents. The children, their counselor, and Foster Father all testified as to the children's close relationship with their foster parents, whom they refer to as "mom" and "dad." Although Mother's belated steps to address her drug addiction are encouraging, her efforts are too little, too late.

## IV.

The record contains clear and convincing evidence to support terminating Mother's parental rights on each of the six statutory grounds relied on by the juvenile

court.  The record also contains clear and convincing evidence that termination is in the children's best interest.  So we affirm the judgment terminating the parental rights of Mother.

_____
W. NEAL McBRAYER, JUDGE